UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                    Case No. 18-cv-109-pp

JACK A. CLAYBORNE,

                    Defendant.

**ORDER GRANTING GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY
OF DR. NEUSCHATZ (DKT. NO. 160)**

## I.     Background

In his August 19, 2019 recommendation that this court deny the

defendant's motion to suppress, Magistrate Judge David E. Jones recounted

the facts of the case:

> On July 7, 2016, Michael Guster became the victim of an attempted carjacking. *See* Defendant's Motion to Suppress Evidence 4-5. As Mr. Guster parked his car in his garage, two masked men approached with guns drawn. *Id.* at 4. The men fired shots, and a bullet went through both of Mr. Guster's legs. *Id.* at 5. Mr. Guster, legally carrying a handgun, shot back at the two men and hit one of them who was later identified as Eric Booker. *Id.* The two armed and masked men fled the scene and approximately ten minutes later, a man stripped down to his underwear showed up at the door of nearby resident, P.P. Def.'s Mot. to Suppress 5. The man asked P.P. to provide him with some clothes and then he retreated. *Id.* at 5-6.

> Shortly after the attempted carjacking, Mr. Guster was interviewed by a detective. Mr. Guster described the person that shot him as a "black male, 23-25 years old, medium complexion, medium build, 6'0-6'1", 180-190 pounds, 1-2" afro, wearing a mask which covered his mouth and nose." Def.'s Mot. to Suppress 6. P.P., who was also interviewed by a detective, described her visitor as a "black male,

1

6'0, mid 30s, medium build, caramel complexion, bald, no scars or tattoos." *Id.*

By August 1, 2016, Jack Clayborne was identified as a suspect through video surveillance from July 7, 2016, which showed a wounded Eric Booker being dropped off at a hospital by someone driving a Ford Taurus with Illinois license plates. Def.'s Mot. to Suppress 6-7. Law enforcement ran the plates which listed to Jack Clayborne. *Id.* at 7. An FBI agent contacted Jack Clayborne who explained that he'd given his Taurus to his son—also named Jack— who took it to Milwaukee and returned it around July 10. *Id.*

In February 2018, law enforcement officers offered Mr. Guster and P.P. an opportunity to identify Mr. Clayborne as the person they observed. Def.'s Mot. to Suppress 7. FBI Agent Lucker and Detective [Klabunde] put together a photo array comprised of six photographs, one of Mr. Clayborne and five random others purported to resemble Mr. Clayborne. *Id.* at 8. Detective [Klabunde] first presented P.P. with form instructions and then he showed her the six photos in sequential fashion, with Mr. Clayborne's photo appearing fourth. *Id.* P.P. hesitated between pictures two and four, but described herself as "pretty certain" that the fourth photo depicted the unclothed man that came to her door. *Id.* Detective [Klabunde] repeated the process for Mr. Guster who also picked out Mr. Clayborne from the photo array because of his nose and mouth shape. *Id.* at 9.

Dkt. No. 79 at 2-3. In adopting Judge Jones's recommendation, this court reiterated those facts. Dkt. No. 101 at 9-10.

On August 9, 2016—just over a month after the incident described above—a federal grand jury charged Eric Booker with attempted carjacking in violation of 18 U.S.C. §2119(2) and knowingly using, carrying brandishing and discharging a firearm during and in relation to that offense in violation of 18 U.S.C. §924(c). United States v. Booker, Case No. 16-cr-125-LA (E.D. Wis.), at Dkt. No. 1. On January 25, 2017, a jury found Booker guilty on both counts. Id. at Dkt. No. 35. Over a year later—on February 26, 2018—Judge Lynn Adelman sentenced Booker to serve thirty-six months on the attempted

2

carjacking count and 120 months on the §924(c) count, to run consecutively to the sentence imposed on the carjacking count, for a total sentence of 156 months, or thirteen years. Id. at Dkt. No. 57.

On May 15, 2018, a grand jury charged the defendant and Sylvance Brown with attempted carjacking, 18 U.S.C. §2119; using, carrying, brandishing and discharging a firearm during and in relation to a crime of violence, 18 U.S.C. §924(c)(1)(A)(i)-(iii); and unlawful possession of ammunition by a prohibited person, 18 U.S.C. §922(g)(1). Dkt. No. 14. These charges, like the charges against Eric Booker, were based on the July 7, 2016 incident involving Mr. Guster. Brown later pled guilty to two of the counts. Id. at 144.

That leaves the defendant as the only one of the three men charged in the July 7, 2016 incident whose charges remain outstanding. The defendant's trial is scheduled to begin January 10, 2021. Dkt. No. 138. He lists among his potential witnesses Dr. Jeffrey Neuschatz of Hunstville, Alabama. Dkt. No. 158 at 4. On December 23, 2021, the government filed a motion to exclude the testimony of Dr. Neuschatz, whom the government asserts is being offered "as a defense expert on eyewitness memory." Dkt. No. 160 at 1. The defendant opposes the motion. Dkt. No. 167.

## II.     Dr. Neuschatz's Credentials and Report

### A.     _Curriculum Vitae_

The defense has filed Dr. Neuschatz's _curriculum vitae._ Dkt. No. 158-9. According to his CV, Neuschatz currently is a distinguished professor in the department of psychology at the University of Alabama in Huntsville. Id. at 1.

He has been a professor—first an assistant professor, then an associate professor, then a full professor and finally a distinguished professor—at the University of Alabama/Huntsville for twenty-one years. Id. He has a Bachelor of Science in psychology from Roger Williams University, a Master of Science in experimental psychology from the State University of New York College at Cortland and a Ph.D. in cognitive psychology from Binghamton University. Id.

Dr. Neuschatz lists in his CV the grants he has received, including a grant in 2017 to fund research in "Eyewitness Identification Confidence," two grants comparing show-ups and lineups as identification techniques and a mini-grant on the effect of post-identification feedback on the elderly. Id. at 2. He has co-authored three books: one about jailhouse informants, one about psychology and the law and one (in 2012) titled "Psychology of Eyewitness Memory." Id. Neuschatz has authored numerous articles in referred journals (several of the articles are about eyewitness testimony, lineup identifications and show-up identifications). Id. at 2-6. He has co-authored book chapters and law review articles on memory gaps and errors, eyewitness memory in older adults, the cognitive psychology of memory, false memories and applied memory. Id. at 6-7. He has co-authored articles about eyewitness identification and memory in publications such as *The Champion* (the magazine of the National Association of Criminal Defense Lawyers) and the *Encyclopedia of Psychology & Law*. Id. at 7-8. Dr. Neuschatz has spoken at professional conferences and conventions on the issue of eyewitness testimony (as well as other psychology-related topics). Id. at 8-17. His 1999 dissertation was titled,

4

"The phenomenological characteristics of false memories." <u>Id.</u> at 17. He has taught undergraduate classes in sensation and perception. <u>Id.</u> at 18. He is a member of the American Psychological Association, the American Psychology-Law Society and the Society for Applied Research in Memory and Cognition, among others. <u>Id.</u> He is an editor of *Psychology, Crime, and Law* and is a past member of the editorial board of *Law and Human Behavior*. <u>Id.</u>

B.    <u>Expert report</u>

Dr. Neuschatz's report is not dated. Dkt. No. 158-10. In describing the task for which he was retained, he states only that defense counsel "has contacted [him] regarding expert assistance in various eyewitness identification matters at issue in this case." <u>Id.</u> at 1. He summarizes his conclusions—based on discovery materials provided to him by defense counsel—as follows:

> In summary, my overall opinion, based on the scientific research and facts of the case, is that it would be very difficult to make an accurate identification under the conditions in which the encounter occurred. The factors, long retention interval, weapon focus, stress and head covering would make it hard to accurately identify the culprit. Furthermore, best practice guidelines for choosing fillers or known innocent people were not adhered to and therefore could contribute to a false identification.

<u>Id.</u> at 1-2.

Dr. Neuschatz gives a brief, two-paragraph summary of the facts, then moves on to an overview of the scientific research on memory and eyewitness identification. <u>Id.</u> at 2. He discusses research regarding mistaken eyewitness identifications, stating that "[a]ccording to the Innocence Project's web page, "*Eyewitness misidentification is the single greatest cause of wrongful convictions nationwide, playing a role in more than 70% of convictions overturned through*

5

*DNA testing*." Id. at 3-4. (He gives no web address for this web page, but the court assumes he is referencing the web site https://innocenceproject.org.) He also cites Smith, A.M., & Cutler, B.L. (2013), *Introduction: Identification procedures and conviction of the innocent* for the assertion that "[i]n reviewing a larger sample of wrongful conviction cases, mistaken identifications were a factor in about 50% of the cases." Id. at 4.

Dr. Neuschatz then turns to "[s]pecific variables affecting memory," and discusses them in relation to certain facts from this case. He begins with exposure time, explaining that the longer a witness is exposed to a "culprit's" face and the more clear the view, the stronger and more accurate the memory. Id. at 4. He states that in this case, the "entirety of the incident did not last more than a few seconds," and he asserts that the victim "indicated that he only saw part of the culprit's face because the culprit . . . was described by Guster as wearing a mask that covered this from their noses down." Id.

Dr. Neuschatz moves on to "retention interval," which he defines as "the amount of time elapsed between the person's initial experience of an event and the person's attempt to remember information about the event." Id. He explains that longer retention intervals lead to "forgetting, which in turn leads to inaccurate or distorted memories." Id. He also explains that one can learn new—possibly inaccurate—information during longer retention intervals, which could distort memory. Id. Applying that knowledge to the facts of this case,

6

Neuschatz states "[t]hat the time between the event October 7, 2016,[1] and the identification attempts on February 28th, 2018 (Guster) and February 26th, 2018 ([P.P.]) were both about 16 months," and opined that "this is an ample amount of time for memory distortions and forgetting to occur." Id. at 5.

Next, Dr. Neuschatz explains that while it may seem "intuitive that witnesses who give complete and accurate descriptions of the culprit would also be more accurate in their identification decisions," in fact some research has shown that the "relationship between quantity and quality of recall was weak." Id. Citing a particular study from 2008, Neuschatz generalizes that "more inaccurate descriptions were associated with more inaccurate identifications" (a statement which does not seem to follow from his earlier statement). Id. Applying the conclusions of this study to the facts of the instant case, Neuschatz states that

> Mr. Guster described the assailant, per police report the day of the crime, as having a 1-2 inch afro. However, according to the motion to suppress the identification written by the defense dated January 25, 2019. [The defendant] suffers from male pattern baldness and is not capable of growing an afro. To the extent that defense's statement is accurate then description given my [sic] Mr. Guster is inaccurate.

Id.

Dr. Neuschatz next discusses stress—which he defines as "the perception of a potential threat of injury or death to oneself or another person"—and cited studies indicating that "stress impairs eyewitness

---

[1] The incident that gave rise to the charges against the defendant occurred on *July* 7, 2016, not October 7, 2016.

accuracy." Id. at 6. Applying that assumption to the facts of this case,

Neuschatz states:

> Stress is a relevant factor in this case as the nature of the crime is inherently stressful. As noted above stress impair [sic] people's ability to make accurate identifications. To the extent that Mr. Guster experienced stress as a result of being shot by the culprit, his ability to remember some of the details of the event and make an accurate identification could be impaired.

Id.

Turning to what he calls "weapon focus," Dr. Neuschatz explains that "[t]he psychological literature suggests that the presence of a weapon can create competition for an eyewitness's attention to details about an event, leading the eyewitness to focus on the weapon rather than other information about the event." Id. Applying that suggestion to this case, Neuschatz notes that "Mr. Guster described both assailants as having guns," and reiterates that guns "make it more difficult to accurately remember details of the event and the culprit's face." Id. at 7.

The next variable is changes in appearance caused by wearing headgear that covers one's hairline. Id. Dr. Neuschatz discusses research showing that witnesses are more likely to correctly identify a person whose head is uncovered than one who is wearing headgear. Id. at 7-8. From this rather narrow outcome, Neuschatz extrapolates that "appearance change resulting from deliberate attempts to mask features, modest changes in hairstyles and facial hair, and the natural process of aging impair identification accuracy." Id. at 8. Relating that conclusion to this case, Neuschatz states:

> Head covering is clearly relevant to the identification of [the defendant] to Mr. Guster. According to the police reports reflecting the day-of-crime interview, Mr. Guster described the culprit . . . as, "Wearing a mask of some sort, which covered his nose and mouth." To the extent that the culprit's face was uncovered it would increase the change of a false identification.

Id.

Next, Dr. Neuschatz discusses what he calls the "confidence-accuracy relationship," and says that the "average correlation across studies, between confidence and identification accuracy, was only 0.29." Id. He says that this "oft-found weak correlation between confidence and accuracy" is explained by the fact that cognitive, personality and social factors "independent of identification accuracy" affect one's confidence in one's identification. Id. at 9. He states that "[a]ny factor that influences confidence independently of accuracy should attenuate the relationship between confidence and identification accuracy." Id. In applying this information to the facts of the instant case, the report states:

> Confidence in an identification is an informative indicator of accuracy only at the time of the initial identification. Any confidence statement not taken simultaneously with the identification is not informative because confidence is influenced by many factors other than memory of the event. Confidence statements collected at trial and other retrospective accounts are not indicative of accuracy because, after the initial identification, confidence can be altered by a variety of factors including suggestion, exposure time, multiple identifications, and external sources. The confidence-to-accuracy correlation diminishes to almost zero as the time between the crime and the confidence statement increases. Based on the information

provided, reviewed, and analyzed, it does appear that the lineup[2] administrator recorded a confidence statement from Ms.[3] Guster.

While it is not clear, it appears that Dr. Neuschatz concluded that this variable either weighed in favor of—or was neutral in relation to—Mr. Guster's identification of the defendant.

The final variable Dr. Neuschatz discusses is "stranger identifications," his short-hand for studies that showed that witnesses who were familiar with the subject to be identified were much more likely to make correct identifications than those asked to identify strangers. Id. at 9-10. Applying that variable to this case, Neuschatz stated:

> This is relevant to the present case because the culprit was a stranger to both Mr. Guster and [P.P.]. Therefore, both attempted to identify, and at least described, a person with whom they were unfamiliar. As mentioned above, stranger identifications are more susceptible to errors relative to identifying someone the witness is very familiar with, and therefore susceptible to unreliability.

Id. at 10.

At the end of the report, Dr. Neuschatz shifts to a criticism of what he calls "lineup procedures." Id. He discusses a set of recommendations for best practices in "lineup" procedures, including telling witnesses that the perpetrator might not be in the lineup, the use of the "match-to-description" technique for picking fillers, having only one suspect in any given lineup, making sure that

---

[2] Mr. Guster did not identify the defendant from a "lineup," the term usually used for an in-person identification process. He identified the defendant from a photo array.

[3] The court assumes the reference to "*Ms.* Guster" is a typographical error; the victim, Michael Guster, is male.

the suspect doesn't unduly stand out from others, using "blind lineup" administration, assessing the witness's confidence immediately after the identification and before giving any confirmation feedback and video recording the identification procedure. Id. at 10-11. Neuschatz asserts that the detectives who showed photo arrays to Mr. Guster and "P.P." in February 2018[4] followed all of the recommendations "with the exception of fillers or known innocent people in the lineup." Id. at 11. Neuschatz quoted from the police reports prepared on the dates Mr. Guster and P.P. were interviewed, then argues that two of the six photos in the lineups shown to the witnesses did not match the witness descriptions because they had dark complexions; Neuschatz assumes, from the police reports, that both Mr. Guster and P.P. described the suspect as having a medium complexion. Id. at 12.

**III.    Parties' Arguments**

A.    Government's Motion

The government argues that "the Seventh Circuit has repeatedly expressed a 'strong disfavor'—sometimes described as a presumption against admission—of expert testimony on the reliability of eyewitness identification." Dkt. No. 160 at 1 (citing United States v. Hall, 165 F.3d 1095, 1103-04, 1106 (7th Cir. 1999); United States v. Daniels, 64 F.3d 311 (7th Cir. 1995); United States v. Larkin, 978 F.2d 964 (7th Cir. 1992); United States v. Curry, 977 F.2d 1042 (7th Cir. 1992); United States v. Hudson, 884 F.2d 1016 (7th Cir.

---

[4] The report says "2016," but the photo arrays were shown the witnesses in 2018, as Neuschatz himself noted when discussing the retention interval.

1989)). It asserts that the presumption "arises less out of [the] reliability [of expert eyewitness testimony] than its relevance." Id. at 8 (citing Hall, 165 F.3d at 1102-04) (citations omitted). The government concedes, however, that "such testimony is not per se inadmissible." Id. (citing United States v. Carter, 410 F.3d 942, 950 (7th Cir. 2005); United States v. Bartlett, 567 F.3d 901, 906 (7th Cir. 2009)).

The government lists a number of cases in which Dr. Neuschatz's testimony was excluded by other courts or in which decisions to exclude his testimony were affirmed (including one federal circuit court). Id. at 8-9 (citing United States v. Davis, 690 F.3d 226, 257-58 (4th Cir. 2012); Welch v. Kentucky, 563 S.W.3d 612, 615-16 (Ky. 2018); Corrothers v. Mississippi, 148 So.3d 278, 297-98 (Miss. 2014); Frazier v. Georgia, 30 Ga. Ap. 274, 275-77 (Ct. App. 2010); Tennessee v. Jackson, 2015 WL 6756318, *4, 7 (Ct. Crim. App. 2015)). It also cites numerous state court case in which the judge has allowed Neuschatz to offer such testimony. Id. at 9 (citing Towns v. Alabama, 293 So.3d 975, 979 (Ct. Crim. App. 2019); Tennessee v. Scott, 2018 WL 3156979, at *1 (Ct. Crim. App. 2018); Tennessee v. Chandler, 2018 WL 1778667, at *3 (Ct. Crim. App. 2018); Jackson v. Tennessee, 2018 WL 1182794, at *4 (Ct. Crim. App. 2018); Tennessee v. Baker, 2017 WL 2928793, at *4-6 (Ct. Crim. App. 2017); Tennessee v. Taylor, 2015 WL 127869, at *3-4 (Ct. Crim. App. 2015); Tennessee v. Price, 2009 WL 2767161, at *2 (Ct. Crim. App. 2009)).

The government then turns to the details of Dr. Neuschatz's proposed testimony. While its analysis of Neuschatz's application of the variables to the

12

facts of this case is detailed, it boils down to two arguments. First, the government argues that much of what Neuschatz proposes to tell the jury is "obvious," "within the common experience of the jury" and can be addressed through vigorous cross-examination of the witnesses. Dkt. No. 160 at 10, *inter alia.* Second, the government argues that Neuschatz's application of these variables to the facts of this case is unreliable because he relied on inaccurate facts. The first argument is self-explanatory. The second requires some explanation.

In his report, Dr. Neuschatz says that he was provided discovery materials by defense counsel. Dkt. No. 158-10 at 1. He does not describe those discovery materials, so one cannot tell from the report which discovery materials he reviewed. One can deduce, however, that he received a July 7, 2016 police report from Detective Schroeder of the MPD, in which Schroeder states that the victim, Mr. Guster, described one of the suspects who shot him as a black male, 23-25 years old, with a medium complexion, medium build, 6'0" to 6'1", 180-190 lbs., with a 1-2" afro, black shirt, tan shorts, armed with a black handgun and wearing a mask of some sort that covered his nose and mouth. One can make this deduction because Neuschatz assumes throughout his report that this is the way Mr. Guster described the suspect when he was talking to the police on the day of the incident. See, *e.g.*, Dkt. No. 158-10 at 5, 12. As the government explains, the problem with Neuschatz's assumption— and his application of variables impacting the accuracy of eyewitness identifications based on that assumption—is that that is *not* how Mr. Guster

13

described the suspect. While that *is* what Schroeder wrote in the July 7, 2016 police report, dkt. no. 162-1, it is *not* what Mr. Guster said to Schroeder.[5] We know this because Schroeder recorded his July 7, 2016 interview with Mr. Guster, while Mr. Guster was in the hospital being treated for the gunshot wounds he received. Dkt. No. 162-6 (Transcript of the audio interview). In the actual interview, Mr. Guster told Schroeder that he couldn't see the man too well, but that Mr. Guster's mother said he was wearing tan-colored shorts. Mr. Guster told Schroeder that the man was wearing something—not a mask, but maybe something like a bandana—that covered his mouth and some of his nose. Mr. Guster was able to tell Schroeder that the man was Black. Id. So, the government argues, Neuschatz applied the variables he described to a description that Mr. Guster did not actually give.

The government also notes that while Dr. Neuschatz occasionally mentions the neighbor, P.P., he did not apply his variables consistently or clearly to her identification. See, *e.g.* Dkt. No. 160 at 12. And to the extent that he mentioned or applied the variables to P.P.'s identification, the government argues that Neuschatz again relied on a description P.P. did not give. Looking at the police report, Neuschatz indicated that P.P. described the man who appeared on her doorstep as "black male 23-25 years of age with a medium complexion, 6'00 to 6'01, 180-190 pounds with a medium build. 1-2 inch afro

---

[5] The government speculates that Detective Schroeder may simply have gotten Mr. Guster's description confused with the one given by his mother when she called 911, because the description Schroeder attributes to Mr. Guster is identical to the description Mr. Guster's mother provided the 911 dispatcher. Dkt. No. 160 at 11 (citing Dkt. Nos. 162-10 and 162-12).

and clean shaven. Wearing a black t-shirt and tan shorts." Dkt. No. 158-10 at 12. In fact, Detective Lori Rom interviewed P.P., who described the suspect as a Black male, 6'0", mid-thirties, medium build, caramel complexion, bald with no scars or tattoos. Dkt. No. 162-3. And, as the government notes, P.P. would hardly have described the man who appeared on her doorstep as wearing a black t-shirt and tan shorts, because he appeared on her doorstep wearing nothing but his underwear. Dkt. No. 160 at 19.

These errors and others, the government argues, show that Dr. Neuschatz's methodology was unreliable. It argues that to allow him to testify about applying the variables to incorrect facts would confuse and mislead the jury and unfairly prejudice the government. Id. at 14.

Finally, the government argues that the eyewitness identifications made by Mr. Guster and P.P., while important, are secondary evidence. Id. at 21. The government cites to various pieces of corroborating evidence demonstrating that the defendant was the person who was involved in the incident on July 7, 2016. Id. at 20.

B.    Defendant's Brief in Opposition

The defendant asserts that "[w]ithout the government's promise of a Rule 35 motion so Booker would name [the defendant] as a co-actor, there would be no case against [the defendant]." Dkt. No. 167 at 2. He asserts that the government's "main evidence" is the testimony of Eric Booker or Sylvance Brown, "(both of whom have continuously lied and manipulated federal agents and have changed their stories numerous times)," and he says that "[o]nly with

15

that testimony does any other evidence have any ties to [the defendant]." Id. He asserts that "[w]ithout the victim's and neighbor's eyewitness identification of [the defendant], the government's case—and any 'corroborated' narrative of [the defendant's] involvement—vanishes." Id. at 3.

After discussing Dr. Neuschatz's qualifications and the legal standard, the defendant states that in addition to the seven state court cases in which Neuschatz has been allowed to present expert eyewitness testimony, there have been two federal cases in the Southern District of Florida. Id. at 4. (The defendant says that these cases are "unpublished" and provides no citation that would allow the court or the government to review them. When the government asked for the citations, the defendant was unable to provide them. Dkt. No. 168 at 2 n.1.) The defendant distinguishes some of the cases in which courts declined to allow Neuschatz's testimony. Id. at 5-7. He argues, repeatedly, that in other cases there was corroborating evidence to support the eyewitness identifications and asserts that there is no such corroborating evidence in this case. Id.

As to Dr. Neuschatz's reliance on a description that the victim did not give, the defendant asserts that Detective Schroeder wrote two reports—the original and a supplemental—and in both attributed the same description to Mr. Guster. Id. at 10. The defendant argues that "Detective Schroeder's report was relied upon by the police in making their photo-arrays and, moreover, it does accurately reflect what the victim and the victim's mother described." Id. When comparing what Mr. Guster actually said in the recorded hospital

Case 2:18-cr-00109-PP   Filed 01/05/22   Page 16 of 38   Document 171

interview and what Schroeder wrote in his report, the defendant says that Schroeder "acted as any reasonable officer would" and "simply filled in the victim's mother's description." Id. While conceding that Mr. Guster said nothing about the suspect's hair, the defendant emphasizes that at Booker's trial, Mr. Guster's *mother* testified that the suspect had an afro. Id. at 10-11. He asserts that the defense "should not be punished" for the fact that the government's witness wrote an inaccurate report and that the "victim-witness . . . continuously contradicts himself." Id. at 11.

The defendant then goes through each of the variables Dr. Neuschatz applied and reiterates what Neuschatz said. Id. at 12-16.

The last section of the defendant's brief is titled, "Dr. Neuschatz Will Not Opine on the Neighbor's Identification." Id. at 16. Addressing the government's concerns about Neuschatz's analysis regarding P.P.'s identification of the defendant, the defendant states that "Dr. Neuschatz did not apply his principles to the neighbor because they are not applicable. The neighbor's identification is of the naked man, who claimed to be robbed, that showed up at her door." Id. The defendant states that he "will exclude Dr. Neuschatz's testimony regarding the neighbor's eyewitness identification to prevent any confusion." Id. The defendant states:

> Dr. Neuschatz will not testify to the following points. Any opinions relating to the neighbor's identification of the naked-robbed-man at her door. Dr. Neuschatz will not cite Kaitlyn Ensor's report dated January 10, 2019. Exhibit 2 at 12. Dr. Neuschatz's testimony will be limited to issues regarding the victim's identification and the related descriptions of the victim and the victim's mother and the neighbor. However, the only photo-identification array he will focus on is the victims.

17

<u>Id.</u> at 16-17.

The defendant concludes by stating that that the government "downplays" the importance of Mr. Guster's eyewitness identification, and asserts that without it, "the 'corroborating evidence' lacks any probative value." He asserts that the court can instruct the jury on how to consider Dr. Neuschatz's testimony. <u>Id.</u> at 18. He asks that if the court excludes Neuschatz's testimony, "the parties stipulate to the facts exposing the dangers in eyewitness identifications and read that stipulation in, before each eyewitness is examined on its identification." <u>Id.</u>

**IV.    Analysis**

A.    <u>Applicable Law</u>

Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), govern the admissibility of expert testimony. The court, as gatekeeper, "is responsible for ensuring that proposed expert testimony 'is not only relevant, but reliable.'" <u>Timm v. Goodyear Dunlop Tires N. Am., Ltd.</u>, 932 F.3d 986, 993 (7th Cir. 2019) (quoting <u>Daubert</u>, 509 U.S. at 589). "In assessing reliability, 'the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.'" Id. (quoting <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000)).

This determination requires the court to engage in a three-step analysis. "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the

18

trier of fact to understand the evidence or to determine a fact in issue."
Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017) (citing
Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (internal
quotation marks omitted). The Seventh Circuit has clarified that "the district
court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of
the expert's methodology; and (3) the *relevance* of the expert's testimony." Id.
(emphasis in original). It is the burden of the party seeking to introduce an
expert to show that the expert meets the Daubert standard. Id., 877 F.3d at
782.

     Rule 702 states that an expert witness may be qualified as an expert "by
knowledge, skill, experience, training or education." An expert need not have
particular academic credentials to be qualified; "anyone with relevant expertise
enabling him to offer responsible opinion testimony helpful to judge or jury
may qualify as an expert witness." Tuf Racing Prods, Inc. v. Am. Suzuki Motor
Corp., 223 F.3d 585, 591 (7th Cir. 2000).

     To be relevant for purposes of Rule 702, the testimony must assist the
trier of fact to understand the evidence or to determine a fact in issue. Relevant
evidence is evidence "that has any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence." Daubert, 509 U.S. at 587
(quoting Fed. R. Evid. 401). "Where an expert's hypothetical explanation of the
possible or probable causes of an event would aid the jury in its deliberations,
that testimony satisfies *Daubert's* relevancy requirement." Ford Motor Co., 215

F.3d at 718–19. If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have "analytically sound bases," rendering them "more than mere 'speculation' by the expert." Id. at 719 (quoting DePaepe v. Gen. Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998)). The question of whether the expert's theory is correct given the circumstances of a particular case is a factual one left for the jury to determine.

The factors the trial court should consider when determining if an expert's opinion is reliable are:

> (1) "whether [the expert's theory or technique] can be (and has been) tested;"
> (2) "whether the theory or technique has been subjected to peer review and publication;"
> (3) "the known or potential rate of error;" and
> (4) "general acceptance" in the "relevant scientific community."

Daubert, 509 U.S. at 593–94.

Rule 403 of the Federal Rules of Evidence allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

      B.    Application of the Law to the Facts

          1.    *Is Dr. Neuschatz Qualified?*

The government does not contest the qualifications of Dr. Neuschatz and the information the court has recounted from his *curriculum vitae* supports that position. Neuschatz is qualified to testify as an expert on the topic of eyewitness identification.

20

## 2. *Is Dr. Neuschatz's Methodology Reliable?*

The government argues that Dr. Neuschatz's testimony is unreliable because he applied the variables he extracted from the literature listed at the end of his report to eyewitness descriptions of the suspect that Mr. Guster (and P.P.) did not actually provide. There are two aspects to reliability of expert witness testimony. As the <u>Daubert</u> court put it, Rule 702 "establishes a standard of evidentiary reliability," <u>Daubert</u>, 509 U.S. at 590, as well as a requirement of relevance, <u>Daubert</u>, 509 U.S. at 591. So, one aspect is whether the expert's testimony "is the product of reliable principles and methods." Fed. R. Evid. 702(c). This aspect asks whether, in the vernacular, the science upon which the expert relies is "good." The Seventh Circuit has turned to the Rule 702 advisory committee's note to the 2000 amendment to the rule for other factors useful in assessing this aspect of an expert's reliability. <u>Gopalratnam</u>, 877 F.3d at 779-780. One of those factors was "'[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . .'" <u>Id.</u> at 780 (quoting <u>Fuesting v. Zimmer, Inc.</u>, 421 F.3d 528, 534-35 (7th Cir. 2005), <u>opinion vacated in part on reh'g</u>, 448 F.3d 936 (7th Cir. 2006) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

The other aspect is whether the testimony "is based on sufficient facts and data" and whether the expert "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b) and (d). This aspect asks whether, even if the science was good, the way the expert applied that science

was valid based on the facts of the case. The second aspect tends more to the relevance analysis:

> "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702-18. See also *United States v. Downing*, 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

Daubert, 509 U.S. at 591

The government does not appear to dispute part of the first aspect of reliability—whether Dr. Neuschatz's proposed testimony is the product of reliable principles and methods. For the most part, the government does not dispute the existence of the variables Neuschatz extracted from the literature— exposure time, retention interval, description accuracy, weapon focus, hairline and head covering, confidence and stranger identifications—although it refers to them as "common sense principles clothed in jargon." Dkt. No. 168 at 9. Instead, the government asserts that these "'variables' are within the common experience of jurors—at least to the extent required to evaluate the reliability of an eyewitness identification." Id.

The government does take issue, however, with the "science" Dr. Neuschatz used regarding one of the variables—"hairline and head covering." The government argues that in his report, Neuschatz discusses studies comparing witnesses' ability to accurately identify someone wearing a cap or head covering with someone whose head, and hairline, are visible, "then extrapolates, without citation to any research, that a head covering is relevant

22

to the identification." Dkt. No. 160 at 16. The court agrees that Neuschatz's methodology is questionable but would express it differently.

In his report, Dr. Neuschatz cited a book chapter that he co-authored with B.L. Cutler, titled "Eyewitness identification," contained in H.L. Roediger III (Ed.), *Learning and memory: A comprehensive reference: Vol. 2. Cognitive psychology of memory* (pp. 845-865). Dkt. No. 158-10 at 7, 14. He cites this chapter for the broad assertion that "[t]he deleterious effects of changes of appearance on identification accuracy have been examined in several ways." Dkt. No. 158-10 at 7. He then states:

> Cutler and colleagues have examined the effect of wearing a hood or baseball cap to cover the hairline of the culprit. In these studies, witnesses watched videotaped crimes and later attempted lineup identifications. In half of the videotaped crimes, the perpetrator wore a cap and half of his head was uncovered. In each of the six studies, the percent of correct identification decisions (including both target-present and target-absent lineups) was higher when the perpetrator's head was uncovered. The average performance levels across the six studies, which involved over 1,300 eyewitness identifications, was 57% correct when uncovered versus 44% when a hat was worn (Cutler, 2006).[6]

Id. at 7-8.

After discussing a study involving comparisons of the accuracy of identifications of people wearing hats to people not wearing hats, Neuschatz then makes another series of broad, tangentially related statements (with no citations to literature):

> The results from the psychological literature demonstrate that appearance change resulting from deliberate attempts to mask

---

[6] Citing Cutler, B.L. (2006). A sample of witness, crime, and perpetrator characteristics affecting eyewitness identification accuracy. *Cardozo Public Law, Policy, and Ethics Journal*, 4, 327-340.

features, modest changes in hairstyles and facial hair, and the natural processes of aging impair identification accuracy. Conclusions from the studies of appearance change conform to the encoding specificity principle. The encoding specificity principle states that the best memory performance occurs when the stimulus material at encoding matches the items at retrieval. When applied to appearance changes, it would predict, in accordance with this principle, that changes in appearance from the event (encoding) to the identification (retrieval) negatively impact identification accuracy.

Id. at 8.

Dr. Neuschatz concludes that Mr. Guster stated that the suspect was wearing something that covered his nose and mouth (Mr. Guster actually said it covered the suspect's mouth and part of his nose), and that "[t]o the extent that the culprit's face was covered it would increase the chance of a false identification." Id.

Dr. Neuschatz identifies one study comparing accuracy of identification of people wearing hats with people not wearing hats. There is no evidence in this case that the suspect was wearing a hat or had his head covered. That study has no direct bearing on the evidence in this case. Neuschatz takes the conclusion from that single study—that being able to see the suspect's hairline and head makes a witness more likely to make an accurate identification—and extrapolates the larger general principle that changes in appearance affect accuracy of identification but cites no studies in support of that broader principle. He then pivots and asserts that a witness who sees someone whose face is partially covered is less likely to make an accurate identification—again, without citing any studies supporting the principle.

Dr. Neuschatz's methodology is not reliable with regard to this "variable." There probably are studies indicating that identifications of someone whose face was partially covered are less likely to be accurate than are identifications of someone whose full face is visible, but Neuschatz did not reference such studies. Instead, as the Seventh Circuit put it, he "'unjustifiably extrapolated from an accepted premise to an unfounded conclusion . . . .'" Gopalratnam, 877 F.3d at 780. And he appears to have done exactly what the government argues the jurors can do—state the obvious. It is harder to identify someone when one sees only part of that person's face than when one sees the person's entire face.

Even more concerning is the government's argument regarding the second aspect of expert witness reliability—whether Dr. Neuschatz had sufficient facts and data and whether he reliably applied the science to those facts and data. The defendant's protestations to the contrary, Neuschatz based his conclusions on the incorrect assumption that the eyewitness descriptions in the police reports were the descriptions the eyewitnesses actually gave. In at least one instance, Neuschatz confused which eyewitness the police report was referencing. The government concedes that as to Mr. Guster, the police report simply was wrong. Wherever Detective Schroeder got the description that he put in his July 7, 2016 report—whether from Mr. Guster's mother's description given to the 911 dispatcher or from some other witness—it was *not* the description Mr. Guster provided. Mr. Guster's description is audible in the recording of Schroder's interview with him (which the government provided the court) and appears in the transcript of that interview. It is *not* the description

25

on which Neuschatz relied. Either Neuschatz did not have sufficient facts and data—perhaps defense counsel did not provide him with the audio of Schroeder's interview with Mr. Guster or the transcript of that interview—or he had all the facts and data but ignored some of those facts because they did not fit his hypothesis. Either way, his methodology was not reliable and his analysis that a description that Mr. Guster did *not* give was flawed for the reasons Neuschatz identifies is not relevant to the jury's determination of guilt or innocence.

After reading the government's criticism of Dr. Neuschatz's scant (almost non-existent) analyses of P.P.'s eyewitness identification—particularly Neuschatz's failure to note that P.P. had more time to view the suspect, that she didn't have a gun pointed at her when she viewed him and that there appears to be no evidence that she was under any particular stress when she viewed him—the defendant says that Neuschatz "will not opine" on P.P.'s identification. Dkt. No. 167 at 16. Not so fast, says the government. Dkt. No. 168 at 6. The government argues that the same principles Neuschatz applied to demonstrate that Mr. Guster's eyewitness identification was less reliable apply to P.P.'s eyewitness identification, and that they show that her identification was *more* reliable. Id. at 6-7. The government argues that Mr. Guster's identification and P.P.'s are linked—the two observed the suspect within minutes of each other, blocks away from each other, and both picked the same person out of the same photo array. Id. at 7-8. Even Neuschatz's report blurred and blended the two identifications. Id. at 8. As the government notes, "[e]ven if

the defendant withdraws his testimony about the neighbor, the Government will certainly enquire about it because Professor Neuschatz's analysis bears significantly on his own credibility and on the reliability of the neighbor's identification." Id.

The court agrees with the government that Dr. Neuschatz's perfunctory, selective treatment of P.P.'s eyewitness identification also demonstrates that his methodology was unreliable. While the defense now argues that Neuschatz's principles did not apply to P.P.'s identification, *Neuschatz* does not appear to have realized that when he was writing his report, because he *did* attack some aspects of what he perceived to be her description of the suspect. Though Neuschatz was vague in the extreme about what the defense has retained him to do, he appears to have believed that he was to analyze both Mr. Guster's and P.P.'s identifications. That he chose to ignore those aspects of P.P.'s identification where a variable did not make her identification less reliable demonstrates that Neuschatz's methodology was not reliable.

The court agrees with the government that in several respects, Dr. Neuschatz's testimony is not reliable.

3. *Will Dr. Neuschatz's Testimony be Helpful to the Trier of Fact?*

The government argues both that Dr. Neuschatz's testimony will not be helpful to the trier of fact and that its probative value will be substantially outweighed by the danger of unfair prejudice, confusion of issues and misleading the jury. Fed. R. Evid. 403.

27

The government is correct that there is a line of Seventh Circuit cases from the 1990s disfavoring expert testimony on the reliability of eyewitness identification. In its 1999 decision in <u>Hall</u>, the Seventh Circuit expressed doubt about whether such expert testimony would be helpful to a jury. <u>Hall</u>, 165 F.3d at 1107. The court opined that "any weaknesses in eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses." <u>Id.</u> (citing <u>Larkin</u>, 978 F.2d at 971). It warned that "the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses." <u>Id.</u> In an even earlier case, the court explained that "expert testimony regarding the potential hazards of eyewitness identification—regardless of its reliability—'will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding' of the particular factual issues posed." <u>Larkin</u>, 978 F.2d at 971 (quoting <u>Hudson</u>, 884 F.2d at 1024, <u>cert denied</u>, 496 U.S. 939 (1990)).

As recently as 2005, the Seventh Circuit reiterated these concerns. In <u>Carter</u>, 410 F.3d 942, an eyewitness to a bank robbery identified the defendant from a six-person photo array. The defendant wanted to call a psychologist "to inform the jury that an eyewitness's memory can sometimes be inaccurate;" the psychologist was to opine "about factors that could affect memory, including the circumstances surrounding the event in question, the amount of stress on the eyewitness, the amount of attention paid by the witness, and the law

28

enforcement procedures used to elicit the witness's memory." Id. at 950. The district court declined to appoint the psychologist as an expert, holding that "the proposed testimony . . . would not aid the jury in its determination and, further, that any such testimony might actually confuse, mislead, or unduly influence the jury." Id. On appeal, the defendant asserted that the district court had abused its discretion. Id. at 949. The Seventh Circuit disagreed.

> In general . . . jurors understand that memory can be less than perfect. *See Hall*, 165 F.3d at 1105 ("the hazards of eyewitness identification are 'well within the ken of most lay jurors'") (quoting *United States v. Larkin,* 978 F.2d 964, 971 (7th Cir. 1992)). Such awareness is even greater when potential problems in eyewitness identification are brought to the jury's attention through cautionary instructions. *See United State v. Crotteau*, 218 F.3d 826, 832-33 (7th Cir. 2000). Furthermore, "the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses." *Hall*, 165 F.3d at 1107. Consequently, there is a "long line of Seventh Circuit cases holding that district courts did not commit abuses of discretion by excluding expert testimony regarding the reliability of eyewitness identifications." [*United States v.*]*Welch*, 368 F.3d [970,] at 973 [7th Cir. 2004]) (citing *Crotteau*, 218 F.3d at 833; *Hall*, 165 F.3d at 1105; *Daniels*, 64 F.3d at 315; *Larkin*, 978 F.2d at 971; *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992)). While recognizing this line of cases, the district court correctly realized that "expert testimony regarding eyewitness identification, memory, and perception is not per se unhelpful." *Welch*, 368 F.3d at 975; *see also Hall*, 165 F.3d at 1104-05 (citing *Curry*, 977 F.2d at 1051-52). Here, the district court exercised discretion by evaluating the facts and circumstances of this particular case in light of our case law and, further, did not abuse its discretion in concluding that this case did not present "an unusual or compelling situation in which the aid of an expert witness is required."
>
> In addition, the district court's decision was bolstered by three "additional considerations." *Hall*, 165 F.3d at 1107. First, [the witness] was cross-examined on his ability to perceive, remember, and identify [the defendant] as the bank robber. *See Welch*, 368 F.3d at 974-75. Second, the government had significant additional

evidence (e.g., getaway car, shoe print, crack pipe DNA) to corroborate [the witness's] identification. *See Hall*, 165 F.3d at 1107-08 ("[T]he existence of corroborating evidence undercuts the need, except in the most compelling cases, for expert testimony on eyewitness identifications."). Third, the district court twice cautioned the jurors, through instructions, about assessing witnesses and the risks associated with eyewitness identifications. *See Crotteau*, 218 F.3d at 832, 33. These developments—especially the jury instructions, which effectively gave the jury the same key points on eyewitness identifications that the expert would have presented to them—provide further support for the district court's conclusion that the proposed expert testimony would not assist the jury. The district court did not abuse its discretion.

Id. at 950-951.

In 2009, the Seventh Circuit concluded that a district court had not abused its discretion in excluding expert witness testimony about the high error rates of eyewitness identifications. In Bartlett, 567 F.3d 901, 906 (7th Cir. 2009), the district judge excluded the proposed testimony because "jurors could determine the reliability of identifications using the evidence from direct and cross examinations," as well as under Rule 403. The Seventh Circuit stated:

The first of these reasons is weak. Doubtless lawyers will ask questions designed to assist the jurors in evaluating whether a witness is telling the truth. But the problem with eyewitness testimony is that witnesses who *think* they are identifying the wrongdoer—who are credible because they believe every word they utter on the stand—may be mistaken. Study after study has shown very high error rates in the identification of strangers. See, e.g., Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* (3d ed. 1997) (collecting studies); Elizabeth F. Loftus, *Eyewitness Testimony* (1979; rev. ed. 1996); Daniel L. Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 112-37 (2001). "An important body of psychological research undermines the lay intuition that confident memories of salient experiences . . . are accurate and do not fade with time unless a person's memory has some pathological impairment . . . . The basic problem about

30

testimony from memory is that most of our recollections are not verifiable. The only warrant for them is our certitude, and certitude is not a reliable test of certainty." *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 296-97 (7th Cir. 1990) (citations to the scholarly literature omitted).

It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is *how* fallible, and thus how deeply any given identification should be discounted. That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are *correct*. Many people believe that identifications expressed with certainty are more likely to be correct; evidence that there is no relation between certitude and accuracy may have a powerful effect.

Id.

Even so, the court noted that such testimony could "sidetrack a trial," and instructed district court judges to "balance the benefits of illuminating evidence against the costs of collateral inquiries." Id. The court noted that that is why "Rule 403 grants discretion to the trial judge—and why we have held, many times, that a trial court does not abuse its discretion by excluding expert evidence about the reliability of eyewitness testimony." Id. (citing Carter, 410 F.3d at 950; Hall, 165 F.3d 1095). The Bartlett court concluded that the district judge did not abuse his discretion in excluding the expert witness testimony because the conviction did not rest on the eyewitness identifications. Id. The court explained:

Only two of the people who identified [the defendant] were strangers to him. The other four knew him well. The social-science studies do not suggest that people who have known one another for weeks or years are apt to err when identifying them in court. What's more, the scholarly work concerns identification by *single* eyewitnesses, not the probability of error when multiple witnesses identify the

31

same person. If the six in-court identifications of [the defendant] were independent, and each had a probable error rate of .333 (that is, there is a one-in-three chance that any witness was mistaken), then the probability that [the defendant] is innocent is .333 to the sixth power, or well under 1%. We have remarked that the scholarly findings about eyewitnesses have only limited application when multiple witnesses identify the same person. See *United States v. Williams*, 522 F.3d 809 (7th Cir. 2008); *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003). [The defendant] did not proffer any evidence about the error rates in six-fold identifications. Nor did he propose to ask an expert whether the six identifications should be regarded as independent, or what the risk of error in these identifications taken jointly is apt to be. Someone who proposes expert testimony must show how the findings apply to the litigation at hand; [the defendant] did not do this.

A concurring opinion in *Hall* added that, although jurors should be made aware of the scholarly findings in appropriate cases, it is often better to have the judge summarize the state of knowledge than to have a parade of experts. 165 F.3d at 1120.[7] [The defendant] did not ask the judge to recap the scholarly findings for the jurors' benefit. For him, it was an expert on the stand or it was nothing; the district

---

[7] "Similarly, a judge, recognizing the main conclusions of the scholarly study of memory—that 'accuracy of recollection decreases at a geometric rather than arithmetic rate (so passage of time has a *highly* distorting effect on recollection); accuracy of recollection is *not* highly correlated with the recollector's confidence; and memory is highly suggestible—people are easily "reminded" of events that never happened, and having been "reminded" may thereafter hold the false recollection as tenaciously as they would a true one,' *Krist*, 897 F.2d at 297 (emphasis in original)—could block a lawyer from arguing that a given witness is *sure* of his recollection, and therefore is more likely to be right. The judge could inform jurors of the rapid decrease of accurate recollection, and the problem of suggestibility, without encountering the delay and pitfalls of expert testimony. Jurors are more likely to accept that information coming from a judge than from a scholar, whose skills do not lie in the ability to persuade lay jurors (and whose fidgeting on the stand, an unusual place for a genuine scholar, is apt to be misunderstood). Altogether it is much better for judges to incorporate scientific knowledge about the trial process *into* that process, rather than to make the subject a debatable issue in every case. There remains a question about where judges acquire scientific knowledge, for they too may be mistaken in what they think they know. Still, professional adjudicators who attend continuing judicial education programs and read the scholarly literature are more likely to absorb the lessons of science than are jurors force fed a little information during a trial." Hall, 165 F.3d at 1120 (Easterbrook, J., concurring).

Case 2:18-cr-00109-PP   Filed 01/05/22   Page 32 of 38   Document 171

court did not abuse his discretion in blocking that testimony in order to keep this trial on track.

Id. at 906-07.

In United States v. Schiro, the Seventh Circuit found no error in a district court judge's exclusion of expert witness testimony that "voice identifications are often mistaken." 679 F.3d 521, 529 (7th Cir. 2012). The court explained:

> A victim's daughter identified [the defendant's] voice as that of the man who called her father on the day of the father's disappearance. [The defendant] wanted to present an expert witness who would testify that voice identifications are often mistaken. The judge excluded the evidence. He was skeptical about its empirical basis and also thought that the jury already had a good understanding of the fallibility of "earwitness" identification. We do not suggest that such expert evidence is worthless or that jurors always grasp the risk of misidentification inherent in eyewitness and earwitness testimony. But a trial judge has a responsibility to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury. See Fed. R. Evid. 403. Both reliability and potential for confusion were factors in this case and we cannot say the judge abused his discretion in refusing to admit the expert evidence, which the jury might have taken as a signal that it should disregard the witness's identification testimony. See *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009). If jurors are told merely that voice identifications frequently are mistaken, what are they to do with this information? The defendant's lawyer will argue mistaken identification and jurors told that such mistakes are common may be afraid to make their own judgment.

Id.

The government argues that the "variables" Dr. Neuschatz identifies are "common sense principles clothed in jargon." Dkt. No. 168 at 9. Based on his statements in Bartlett, Judge Easterbrook might disagree *if* Mr. Guster's eyewitness identification were the only evidence indicating that the defendant

33

was involved in the July 7, 2016 incident. If the jurors were being asked to rely solely on Mr. Guster's identification, it might be critical for them to know that Mr. Guster's degree of certainty about the person he selected from the photo array could indicate that the identification was less accurate, or that it is harder to identify someone accurately when one has a gun pointed at one or is under stress. But as Judge Easterbrook also discussed in <u>Bartlett</u>, and as the Seventh Circuit discussed in <u>Hall</u>, the existence of other eyewitness identifications and other corroborating evidence "undercuts" the need for expert testimony of the sort Neuschatz proposes to present. <u>Hall</u>, 165 F.3d at 1107 ("[g]enerally speaking, the existence of corroborating evidence undercuts the need, except for the most compelling cases, for expert testimony on eyewitness identifications"); <u>see also Curry</u>, 977 F.2d at 1052; <u>United States v. Kime</u>, 99 F.3d 870, 885 (8th Cir. 1996). The <u>Hall</u> court found that the eyewitness identifications in <u>Hall</u> were not of primary importance and that there was substantial corroborating evidence implicating the defendant. <u>Id.</u> at 1107-08. <u>See</u> <u>Carter</u>, 410 F.3d at 950 (considering the additional evidence the government had to corroborate the defendant's identification when affirming the district's court's decision to exclude expert testimony on eyewitness identifications); <u>Bartlett</u>, 567 F.3d at 906-907 (discussing multiple eyewitnesses, to some of whom the defendant was not a stranger).

There is significant corroborating evidence supporting the identification of the defendant as the individual involved in the July 7, 2016 incident. The government has both Eric Booker and Sylvance Brown on its witness list.

34

Presumably both will identify the defendant and will say that he was not a stranger to them. The neighbor, P.P., is on the government's witness list and as the court has indicated, several of Dr. Neuschatz's variables support the accuracy of her identification of the defendant as the man who appeared on her doorstep, blocks away and minutes after the attempted carjacking. The car that dropped Eric Booker off at St. Joseph's Hospital immediately after the crime occurred, captured on the hospital's surveillance camera, was registered to the defendant's father, who indicated that he had lent the car to his son to take to Milwaukee and that the car had been returned on July 10, 2016 (three days after the offense). A pair of tan shorts was recovered between the crime scene and the neighbor's house; Mr. Guster said that his mother indicated that the person she observed was wearing tan shorts. The government proposes to introduce cell cite records and maps showing the defendant's, Booker's, and Brown's phones being present near the scene of the crime at the time it occurred.

Because there is significant corroborating evidence, including evidence from eyewitnesses other than Mr. Guster, the eyewitness testimony of Mr. Guster is of secondary importance to the case. Dr. Neuschatz's expert testimony as to the reliability of Mr. Guster's identification of the defendant would not aid the jury under these circumstances.

That conclusion is bolstered by the fact that the parties have submitted proposed jury instructions. As discussed above, the <u>Carter</u> court considered, among other things, the fact that the district judge had given jury instructions

35

that warned the jurors of some of the issues that would have been the subject of the expert's proposed testimony. One of the two jury instructions to which the Carter court referred is now one of the Seventh Circuit's pattern criminal jury instructions; Seventh Circuit law requires that it be given if identification is at issue in the case. When Carter was decided in 2005, it was Pattern Instruction 3.08. Carter, 410 F.3d at 951 n.2. In the current version of the pattern instructions, it is Pattern Instruction 3.12:

> You have heard testimony of an identification of a person. Identification testimony is an expression of the witness' belief or impression. In evaluating this testimony, you should consider the opportunity the witness had to observe the person at the time [of the offense] and to make a reliable identification later. You should also consider the circumstances under which the witness later made the identification.

> The government must prove beyond a reasonable doubt that the defendant is the person who committed the crime that is charged.

Both parties have asked the court to give this instruction, as well as Pattern Instruction 3.01, listing the factors jurors may consider when evaluating the credibility of a witness's testimony. And the court tells juries, both in the court's preliminary instructions and in the final instructions, to "[g]ive the evidence whatever weight you believe it deserves. Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience."

Not only would Dr. Neuschatz's testimony not aid the jury in determining the defendant's guilt or innocence, but any probative value it might have is outweighed by the risk of unfair prejudice, for reasons the court already has discussed. Neuschatz's methodology is unreliable as to the head

36

covering/hairline factor. His testimony is unreliable and irrelevant because his conclusions are based on analyses of descriptions that Mr. Guster did not provide. His analysis of P.P.'s testimony is unreliable and the defense cannot cabin his testimony to critiques favorable to the defense.

Under Rule 403, any probative value of the testimony might have also is substantially outweighed by a danger of undue delay and wasting time. As of the final pretrial conference, the defendant had not agreed to any stipulations, which meant that the government's witness list alone exceeded forty witnesses. Today, the court received from the defendant a motion asking the court to schedule a status conference; in that motion the defendant reported that the parties had reached stipulations on "several evidentiary issues" and that there were some still under discussion. Dkt. No. 169 at 5-6. This is good news. But the court has set aside six business days for this trial. Dr. Neuschatz's testimony likely would take some time, given the need for him to explain his credentials and background and the literature upon which he relied. The government's opposition to his testimony signals that it would conduct significant cross-examination. The expenditure of that time compared to the low probative value of the testimony given the government's other evidence supports granting the government's motion.

Finally, the court notes that at the end of his opposition brief, the defendant asks that if the court "finds Dr. Neuschatz's testimony is 'common knowledge' and that the average juror is aware of the dangers in eyewitness identifications," the "parties stipulate to the facts exposing the dangers in

37

eyewitness identifications and read that stipulation in, before each eyewitness is examined on its identification." Dkt. No. 167 at 18. The court has not based its decision on the conclusion that the variables Neuschatz identified, or the literature he cited, are "common knowledge," nor has it concluded that the "average juror" is aware of the dangers inherent in eyewitness identifications. Even if the court had reached those conclusions and based its decision on them, the court cannot mandate stipulations. A "stipulation" is, by definition, a voluntary agreement by the parties. If the defense and the government wish to enter into such a stipulation, they are free to do so; the court will not require it.

## V.     Conclusion

The court **GRANTS** the government's motion to exclude the testimony of Dr. Jeffrey Neuschatz. Dkt. No. 160.

Dated in Milwaukee, Wisconsin this 5th day of January, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**